# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:20-CR-019 |
| | : | |
| Plaintiff, | : | JUDGE McFARLAND |
| | : | |
| v. | : | |
| | : | **MEMORANDUM IN OPPOSITION TO** |
| | : | **DEFENDANT'S MOTION TO** |
| KARIM ALI RASHID, | : | **SUPPRESS EVIDENCE FROM** |
| | : | **FEBRUARY 4th SEARCHES** |
| Defendant. | : | |
| | : | |

Defendant Karim Rashid has filed a motion to suppress evidence seized on February 4th, during both a traffic stop and a search at his residence at 58 Windsor, Butler County, Ohio. (R. 20.)  The government submits this memorandum in opposition to the motion.

## FACTUAL BACKGROUND

**A. The Underlying Investigation and the October 2019 Incident.**

As background, it is important to summarize the start of the investigation relative to Rashid and his stepson.  On October 18, 2019, the FBI met with a Confidential Informant (the "CI"), who expressed concerns about Defendant Rashid and his stepson.  The CI advised the following:

    1.    Rashid owns an incense company named Our Heavenly Scents and sells packaged incense to businesses in the Cincinnati area.  As of October 2019, Rashid was renting storage units 1451 and 1452 at iStorage on 2201 Mollering Ave., Cincinnati, Ohio.  These storage units were used by Rashid for mixing chemicals and packaging incense.

    2.    According to the CI, Rashid has been violently abusing a 15-year-old stepson for approximately four years.  During that time, Rashid has forced the stepson to

work in the storage units and package incense, without adequate food or water.

      3.     The stepson often escapes from the storage container and runs away. In the month leading up to October 2019, the CI has found the stepson sleeping inside the CI's vehicle, and has also found stepson hiding in a recycling bin on the street. Sometime around September, 2019, the stepson escaped the storage unit and traveled to the CI's home. The stepson proceeded to detail the full extent of the abuse.

The CI provided a video recording of these statements by the stepson to the FBI. On October 18, 2019, the FBI and others conducted a welfare check at iStorage on 2201 Moellering Avenue. The manager relayed that he had previously noticed a strong "cologne like" smell coming out of Rashid's unit. On that occasion, the iStorage manager found the stepson inside the unit. The manager reprimanded Rashid and informed him individuals are not allowed to work or live in the units.

During the welfare check on October 18th, Rashid arrived at the storage unit with the stepson riding in the passenger seat of his vehicle. Rashid was not willing to have a conversation with agents and told the stepson, "do not talk to them, do not answer any of their questions." Rashid and stepson unloaded brown boxes from his vehicle before leaving the storage unit. The FBI advised Hamilton County's Child Protective Services ("CPS") of the information and the video of the stepson. CPS opened an investigation regarding the matter. Law enforcement and CPS tried to locate Rashid based on information available at that time, but were unsuccessful.

Law enforcement attempted to locate Rashid through GPS on his phone, but the data was not specific enough to identify a precise location. It was not until January 2020 that FBI obtained information that Rashid was paying the utilities for a residence in Forest Park (772 Evangeline Road), which is in Hamilton County. FBI advised the Forest Park Police Department and CPS of

this new information. In January 2020, through a GPS ping, law enforcement located Rashid's van and followed him to the 58 Windsor Drive residence in Butler County. However, at that time, law enforcement did not see the stepson or any other kids in the vehicle.

**B. The Traffic Stop in Forest Park on February 4, 2020.**

Forest Park police executed a traffic stop of Defendant Rashid in the early afternoon of February 4, 2020. The stop was near Mr. Rashid's residence in Forest Park. It was raining and overcast at the time of the stop. The traffic citation was for the failure to use headlights under the conditions.[1] Mr. Rashid was not arrested during the stop. His car was not searched. No items of physical evidence were seized. And no statements were made by Rashid or the officers regarding firearms or ammunition (the issues in the Indictment).[2] Accordingly, there is no evidence to suppress from the traffic stop.

Defendant Rashid's stepson was in the vehicle. Based on an existing investigation by Child Protective Services into Rashid's treatment of the stepson, the stepson was removed from Rashid's custody at the traffic stop. The stepson was later interviewed by Child Protective Services at the Forest Park Police Department. Rashid claims that this information derived from the interview of the stepson was "illegally seized" and should be suppressed.

As explained above, the Forest Park officers were aware of an investigation by Hamilton County CPS regarding Rashid's treatment of the stepson. CPS sent a representative to the scene of the traffic stop. Pursuant to the CPS investigation, the stepson was taken into protective custody for an interview at the Forest Park Police Department. Defendant Rashid was free to go

---

[1] In addition to the cited offense, the officer indicated during the stop that Rashid failed to properly signal a turn within 100 feet of the intersection and both Rashid and the stepson were not wearing a seatbelt.

[2] The government has now provided to the defense the citation, report, and video of the traffic stop in Forest Park on February 4, 2020.

and did so, albeit without the stepson.

Prior to the interview with the stepson, a Hamilton County magistrate judge entered an emergency ex parte order for the removal of all of Rashid's children, including the stepson. The order was file-stamped at 4:35 pm on February 4, 2020. The court order further directed law enforcement assistance as needed for the removal of the children.

After the traffic stop, CPS and the FBI conducted an interview with the stepson at the Forest Park Police Department. The interview is briefly summarized in paragraphs 14-16 of the Complaint. In part of the interview, the stepson identified the presence of weapons in the 58 Windsor residence in proximity to Rashid's younger children.

**C. The Seizure at 58 Windsor, Hamilton, Ohio on February 4, 2020.**

On the evening of February 4, 2020, representatives of CPS arrived at Rashid's other residence at 58 Windsor Drive, Hamilton, Ohio. Pursuant to the juvenile court order under the authority of ORC 2151.31, CPS sought to take custody of the additional children. Federal agents and City of Hamilton Police Officers assisted CPS personnel in the process of accessing the Windsor Drive residence and removing the children from the split-level home.

Upon arrival, Rashid's wife and mother of the children (the "Mother") refused to open the door, despite being shown the court order authorizing entry. Eventually, the Mother allowed CPS and law enforcement into the home. Upon entry, children could be heard downstairs crying and the Mother was initially uncooperative in gathering the children. The Mother made statements to law enforcement that there were no firearms in the residence. This was contrary to the information provided by the stepson regarding the firearms. Law enforcement was also aware that the stepson advised that family members were trained in the use of guns toward intruders.

Given these circumstances, law enforcement were present to accompany the Mother and

CPS throughout the home while they arranged for removal of the children. The children were in the downstairs living area of the split-level home. Upon entry to the downstairs living area, law enforcement noticed, in plain view, a fireplace with a removable heater placed partially in front of the opening. There was a gap on the right-hand side of the fireplace. In the space, law enforcement agents were able to clearly see a gun box and two assault style rifles stacked against the fireplace walls. At that point, children were asked to leave the area and the weapons were secured and removed by the law enforcement agents and officers on scene.

The following firearms and ammunition from the fireplace location at the Windsor Drive residence on February 4, 2020:

      a. Armscor revolver (RIA1641977) with six bullets;

      b. Taurus .357 Magnum (2J83527) with five bullets;

      c. An assault style rifle (M92PV008723) with 39 bullets and one magazine; and

      d. DPMS, Inc. rifle .556 (25960) with 74 bullets and 3 magazines.

Pictures of the firearms and the fireplace location will be provided to the Court at the hearing.

## ARGUMENT

**A. There was no seizure, much less, an illegal seizure at the traffic stop.**

As explained above, there was no evidence seized at the time of the Forest Park traffic stop on February 4, 2020. The vehicle was not searched, Mr. Rashid was not searched, and Mr. Rashid was not arrested. The only complaint is that the stepson was removed from Rashid's custody, and then the stepson later provided factual information via an interview. The defense now seeks to suppress the statements by the stepson.

### 1. **The Stepson Was Properly Removed From Rashid's Custody.**

The stepson's removal from Rashid's custody at the traffic stop was fully authorized under O.R.C. Sec. 2151.31. The statute authorizes the removal of a child from custody pursuant to any order under Section 2151.31. Here, CPS obtained an emergency order by phone for the removal of the stepson.

Section 2151.31 also authorizes the removal of a child by law enforcement or CPS *without* an order if:

> (b) There are reasonable grounds to believe that the child is in immediate danger from the child's surroundings and that the child's removal is necessary to prevent immediate or threatened physical or emotional harm; or

> (c) There are reasonable grounds to believe that a parent, guardian, custodian, or other household member of the child's household has abused or neglected another child in the household and to believe that the child is in danger of immediate or threatened physical or emotional harm from that person.

Ohio Revised Code, Section 2151.31(A)(3). The child may also be removed from custody by law enforcement *without* an order if "[t]here are reasonable grounds to believe that the conduct, conditions, or surroundings of the child are endangering the health, welfare, or safety of the child." Ohio Revised Code, Section 2151.31(A)(6).

Here, the emergency order was obtained from a Hamilton County juvenile magistrate pursuant to Section 2151.31, and the stepson was removed from Rashid's custody by CPS. Thus, the removal was authorized by court order. Even without the order, Forest Park police were aware that CPS already had an open investigation related to Rashid and his stepson. Forest Park police were advised by the FBI of the safety concerns related to Rashid and his stepson. Therefore, the officers had authority to remove the stepson from Rashid's custody at the traffic stop, even without the order.

6

Moreover, under all of the circumstances, the removal of the stepson by law enforcement without an order would have been authorized by the child safety provisions of Section 2151.31(A).

### 2. Statements of a Witness Are Not "Fruits of the Poisonous Tree."

Even if there was a constitutional issue with the traffic stop, it does not follow that the stepson's statements to CPS are "fruits of the poisonous tree" subject to the exclusionary rule.

The question is whether the challenged information (the stepson's interview) was derived by exploiting an initial alleged illegality, or instead by means sufficiently distinguishable to be purged of the primary taint. *United States v. Akridge*, 346 F.3d 618, 623 (6th Cir. 2003), quoting *Segura v. United States,* 468 U.S. 796, 804-805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). Evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is "so attenuated as to dissipate the taint." *Id*. For example, there is no exclusion if law enforcement had an "independent source" for discovery of the evidence. *Id*.

In *Akridge*, the Sixth Circuit held that "that the exclusionary rule does not invariably bar the testimony of a witness whose identity is revealed to the authorities as the result of an illegal search." *United States v. Akridge*, 346 F.3d 618, 625 (6th Cir. 2003), quoting, *United States v. Reyes,* 157 F.3d 949, 954 (2d Cir.1998). Instead, exclusion is dependent upon the degree of attenuation between the illegal search and the testimony. *Id*., citing *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), and *Ceccolini,* 435 U.S. at 279, 98 S.Ct. 1054.

Based on *Akridge*, there are specific factors to consider in determining how attenuated the person's testimony is from the purported illegal search, such as:

1. The degree of free will exercised by the witness in speaking to law enforcement;

7

2. The role of the illegality in obtaining the testimony;

3. The purpose and flagrancy of the officials' misconduct;

4. The stated willingness of the witness to testify;

5. The presence of intervening circumstances;

6. The time, place, and manner of the initial questioning of the witness;

7. Whether the witness himself was a defendant;

8. Whether the illegally-seized evidence was used in questioning the witness;

9. The time between the illegal search and initial contact with the witness;

10. Whether investigators knew of the relationship, if any, between the witness and the defendant prior to the illegal search; and

11. Whether the police conducted the illegal search intending to find evidence implicating the defendant.

*United States v. Akridge*, 346 F.3d 618, 626 (6th Cir. 2003).

There is no basis to apply the exclusionary rule to the statements or testimony of the stepson. The stepson is not a defendant or target of the investigation. Law enforcement and CPS already knew the identity of the stepson. Law enforcement learned the essential facts relating to the alleged abuse back in October 2019, when the CI provided the information that he had learned and the video of the stepson's comments. And law enforcement was already aware of information that Rashid had been in possession of firearms.

After the separation from Defendant Rashid and at a separate location, the stepson spoke openly with CPS. His statements were completely voluntary. Nothing from the traffic stop was "used" to coerce or influence the stepson's statement.

8

As explained above, the removal of the stepson was entirely proper pursuant to ORC Sec. 2151.31. Moreover, even if there was an issue with the removal, the applications of the factors in *Akridge* shows no basis to exclude any of the stepson's statements after the traffic stop.

### B. The firearm seizure was valid under the plain view exception.

Defendant Rashid next challenges the warrantless seizure of the firearms and ammunition at the 58 Windsor address on the evening of February 4, 2020. As explained below, the seizure was permissible under the plain view doctrine.

Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011); *United States v. Herndon,* 501 F.3d 683, 692 (6th Cir.2007) (quoting *Dickerson,* 508 U.S. at 375, 113 S.Ct. 2130) (quotation marks omitted).

### 1. The Officers Were Lawfully in a Position to View the Objects.

The first question is whether the law enforcement agents were lawfully in a position from which they could view the object. In other words, the issue is whether the agents were lawfully in the lower level living area of Rashid's home at 58 Windsor on February 4, 2020.

The emergency order of the Hamilton County Juvenile Court authorized the removal from custody of all of Rashid's children, not just the stepson. At the time of the order, the stepson had been located within Hamilton County, near Rashid's Forest Park residence. Additionally, 58 Windsor in Butler County had been identified as one of the two residences that Rashid had been using. The stepson further advised that the other children were living at 58 Windsor. The federal agents and City of Hamilton police officers accompanied the CPS representative to the 58 Windsor residence to execute the emergency order. The order states that the assistance of law enforcement

9

officers was authorized as needed for the removal process.   Thus, the officers were authorized to be in the residence to assist in the removal of the children that evening.

### 2. **The Incriminating Nature of the Object Was Readily Apparent.**

The second issue is whether the law enforcement agents whether the incriminating nature of the object is immediately apparent.   As stated in *Galaviz*, if officers were able to clearly identify the object protruding from beneath the driver's-side seat as part of a handgun, then this prong of the plain-view test is satisfied. *Galaviz,* 645 F.3d at 356; *see Campbell,* 549 F.3d at 373 (upholding the seizure of a handgun from a vehicle under the plain-view doctrine when the butt of the gun was visible under the passenger seat to an officer standing outside the car); *United States v. Weatherspoon,* 82 F.3d 697, 697–99 (6th Cir.1996) (upholding, under plain-view exception, officer's entry into locked car after seeing barrel of gun sticking out from under the seat).

Here, law enforcement agents were aware that Rashid was previously convicted of a felony and that his possession of a firearm was illegal.   In *United States v. Flores*, 193 Fed. Appx. 597, 2006 WL 2497955 (6th Cir. 2006), the defendant gave consent for police officers to search his home for a fugitive. During the search, the officers found a gun under the defendant's bed. *Id*. at 604-05.   Because the officers knew that the defendant was a felon, the incriminating nature of the gun was therefore readily apparent. *Id*.   Accordingly, the seizure of the gun was proper under the plain view doctrine. *Id*.

The same rationale applies here.   The officers could see that the items were firearms. They were aware that Defendant Rashid was a convicted felon.   Therefore, the illegal nature of the object was readily apparent.[3]

---

[3] The *Flores* court also noted that the firearm could be seized for safety reasons, even if the criminal nature of the gun was not immediately apparent. *United States v. Flores*, 193 F. App'x 597, 604–05 (6th Cir. 2006) (noting that a small child was in proximity to the gun).   "The Supreme Court also has indicated that the plain view exception permits the warrantless seizure of 'objects

10

### 3. The Officers Had a Lawful Right of Access to the Firearm.

The third element is whether the officers had a lawful right of access to seize the gun. This element is most relevant when the officers are lawfully on one person's property but see an object to seize on a neighboring property. That is not the case here. The same authority that gave the officers a right to be in the house (the assistance of CPS pursuant to the removal order), also gave the officers the right of access to seize the firearm.

### C. The inter-county enforcement of the emergency removal order.

Rashid challenges the removal of the children because the ORC Section 2151.31 order was entered by a Hamilton County court, but the 58 Windsor address is in Butler County, Ohio. There are several points to address in response.

First, Rashid cites *United States v. Master*, 614 F.3d 236 (6th Cir. 2010) (rejecting reliance on a search warrant from an adjacent county), but Rashid does not cite the decision after remand, *United States v. Master*, 491 Fed. Appx. 593, 2012 WL 3192106 (6th Cir. 2012). The *Master* case was remanded for the district court to consider whether the exclusionary rule should apply in light of the *Herring* balancing test, discussed below. On remand, the district court did not exclude the evidence, and that decision was affirmed by the Sixth Circuit. *United States v. Master*, 491 Fed. Appx. 593, 2012 WL 3192106 (6th Cir. 2012).

Second, this is a case that eventually spanned two counties, but originated in Hamilton County. The investigation regarding Rashid's treatment of the stepson originated in Hamilton County. Rashid previously lived with his family in Hamilton County in 2019 and the reports were

---

dangerous in themselves.'" *Bishop,* 338 F.3d at 626 (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 472, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). This court has held "that a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." *Bishop,* 338 F.3d at 628.

11

that Rashid had been forcing the stepson to work in a storage locker in Hamilton County, Ohio. In fact, on October 18, 2019, Rashid and the stepson were approached by law enforcement at the storage facility in Hamilton County, Ohio. The manager of the storage facility confirmed that Rashid was renting the unit and the stepson had been working inside the unit. However, after that evening, the whereabouts of Rashid and his family were not known to law enforcement.

Law enforcement later investigated information regarding Rashid's whereabouts. Some of the information identified a residence in Forest Park that Rashid had rented. In addition, law enforcement did find and follow Rashid and his wife back to the Butler County house at 58 Windsor on one occasion, but surveillance did not see any of the children, including the stepson. Therefore, when the traffic stop occurred in Forest Park (Hamilton County) on February 4th, it was necessary and logical that the emergency removal order would be obtained from the Hamilton County juvenile magistrate. After all, Rashid was renting a house in Forest Park (Hamilton County), the stepson was just found in Hamilton County, and the reported abusive conduct at the storage unit also occurred with Hamilton County.

Unlike *Master*, this case does not involve a search warrant issued in one county for a residence located in another county. Rather, this case involves an emergency juvenile court order to secure the custody of several children. Children, by their very nature, can be in transit and move from county to county. In fact, this case involves the scenario in which one child was found in Hamilton County and the other children were found in Butler County.

Third, the government expects to provide information to the Court that CPS routinely works with adjacent counties regarding the reciprocity of these orders, particularly when the exact whereabouts of the children is unknown. Moreover, the Ohio Revised Code expressly provides for the transfer of these juvenile proceedings to account for the overlapping residency issues.

12

Ohio Revised Code Section 2151.271 provides that "if the child resides in a county of the state and the proceeding is commenced in a juvenile court of another county, that court, on its own motion or a motion of a party, may transfer the proceeding to the county of the child's residence upon the filing of the complaint or after the adjudicatory, or dispositional hearing, for such further proceeding as required."

The evidence will show that, under these circumstances, CPS was authorized by the emergency order to remove the children from the Butler County address with the assistance of local law enforcement. Because that removal was authorized, the law enforcement officers were permitted to be in the house to assist CPS. As explained above, the plain view exception applies and there is no basis to suppress the seized firearms and ammunition.

**D. Suppression is not warranted under *Herring*.**

Should the Court deem there was a constitutional violation during the seizure of the firearms, suppression is not the proper remedy under *Herring v. United States,* 555 U.S. 135, 129 S.Ct. 695, 699, 172 L.Ed.2d 496 (2009); *United States v. Godfrey*, 427 F. App'x 409, 411 (6th Cir. 2011). Suppression "applies only where it results in appreciable deterrence." *Id.* at 700. In making this determination, the Court must consider the actions of all the police officers involved, assess the efficacy of the exclusionary rule in deterring Fourth Amendment violations in the future, and analyze whether the benefits of deterrence outweigh the costs to the justice system of letting culpable individuals go free. *Godfrey*, 427 Fed. App'x. at 411. If police personnel are responsible for the unconstitutional error, suppression is necessary only if the police conduct is "deliberate, reckless, or grossly negligent ..., or in some circumstances [due to] recurring or systemic negligence." *Id., citing Herring,* 129 S.Ct. at 702.

The Supreme Court has effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.' " *United States v. Master,* 614 F.3d 236, 243 (6th Cir.2010) (quoting *Herring,* 129 S.Ct. at 700).   We explained further that "the *Herring* Court's emphasis seem[ed] weighed more toward preserving evidence for use in obtaining convictions, even if illegally seized, than toward excluding evidence in order to deter police misconduct unless the officers engage in 'deliberate, reckless, or grossly negligent conduct.' " *Id.* (quoting *Herring,* 129 S.Ct. at 702).

Here, the balancing factors in *Herring* weigh against any suppression of evidence.   The law enforcement officers in this case were working towards helping to secure the safety of children.   In doing so, they involved child protective services and relied upon the emergency order of the juvenile court judge.   The officers further agreed to assist the CPS personnel in safely removing the children, during which they noticed the firearms and ammunition.   Under both the plain view doctrine and the public safety exception, the officers were justified in seizing the firearms.   There is no reckless or deliberate conduct to deter.   As in *Master*, the *Herring* analysis precludes any suppression of evidence relating to the February 4th seizure.

For all of the foregoing reasons, the government asks that the Court deny Defendant Rashid's Motion to Suppress Evidence from the February 4th search.

        Respectfully submitted,

        DAVID M. DEVILLERS
        United States Attorney


        s/*Timothy S. Mangan*
        TIMOTHY S. MANGAN (069287)
        ANTHONY SPRINGER
        Assistant United States Attorneys
        221 East Fourth Street, Suite 400
        Cincinnati, Ohio 45202
        Office: (513) 684-3711
        Fax: (513) 684-6385
        E-mail: Timothy.Mangan@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this __ day of April, 2020, electronically on all Counsel of record.

        *s/Timothy S. Mangan*
        TIMOTHY S. MANGAN (069287)
        Assistant United States Attorney