**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:20-cr-19 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| KARIM ALI RASHID, | : | |
| | : | |
| Defendant. | : | |

---

### ORDER DENYING MOTIONS TO SUPPRESS (Docs. 20 and 21)

---

This matter is before the Court on Defendant Karim Ali Rashid's two motions to suppress. (Docs. 20 and 21.) On February 19, 2020, the Grand Jury returned a two-count indictment against Mr. Rashid for possessing firearms in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 2. (Doc. 13.) On March 30, 2020, Mr. Rashid filed two motions to suppress evidence: one to suppress evidence obtained on February 4, 2020 (Doc. 20), and another to suppress evidence obtained on February 5, 2020 (Doc. 21). On June 11, 2020, the Court held a suppression hearing. Both sides offered evidence and testimony. (*See* Doc. 34.) After the hearing, the Court received supplemental briefing. (*See* Docs. 39, 41, and 42.) This matter is now ripe for review.

For the reasons below, the Court **DENIES** both motions to suppress.

### FACTS

The following findings of fact are based on the evidence and testimony the parties submitted at the suppression hearing held on June 11, 2020. (*See* Doc. 34, Transcript of

1

Suppression Hearing.)

### A.  Events leading up to February 4, 2020

In October 2019, two special agents with the Federal Bureau of Investigation ("FBI"), Caleb Yokley and T.A. Staderman, met with a confidential source.  Trans. 127. During that meeting, the source told them that Mr. Karim Rashid had been abusing his stepson C.M.  They did not know C.M.'s exact age, but the source reported that he was a minor.  According to the source, Mr. Rashid regularly punched and kicked C.M.  One time, he knocked C.M. down a flight of stairs.  Another time, the source alleged, Mr. Rashid placed a handgun in C.M.'s mouth.  *Id.* at 9; 102; 145.  At night, C.M. would often be handcuffed to a table. And during the days, Mr. Rashid would force C.M. to work in a storage unit, processing incense for Mr. Rashid's business, without food, water, or access to a restroom.  *Id.* at 129.

After hearing these things, the agents drove straight to the storage unit to conduct a welfare check.  Officers from the Cincinnati Police Department went with them.  At the storage unit facility, Agent Yokley had the opportunity to view the storage units.  The units had three solid walls, no windows, no ventilation, and sliding doors that were locked from the outside with a padlock.  *Id.* at 132.  The agents met the storage unit manager and told him why they were there.  The manager told the agents he knew Mr. Rashid—the two had recently had a verbal altercation after the manager discovered the stepson locked inside the storage unit.  *Id.* at 130.

The altercation happened after the manager was doing his normal rounds and he came across C.M. inside Mr. Rashid's storage unit.  C.M. was working in the unit with

2

the door closed.  The manager told Mr. Rashid that he could not "have people living in these storage units."  *Id.* at 133.

As the agents were talking with the manager, Mr. Rashid arrived at the facility.  A male minor was with him.  The agents asked Mr. Rashid who the minor was, attempting to follow the thread of the information the confidential source had given them that day.  Mr. Rashid refused to talk.  He instructed the minor to do the same.  Mr. Rashid and the minor unloaded some boxes from their vehicle into the storage unit.  Then they left.  *Id.* at 133-35.  At the hearing, Agent Yokley testified that he "now kn[e]w" that the minor was C.M.  *Id.* at 134.

After Mr. Rashid left with C.M., the agents "did the only thing we could do" and "called the 241-KIDS hotline and reported the abuse allegations to Jobs and Family Services."  *Id.* at 135.  Later that day, Hamilton County Jobs and Family Services ("JFS") told Agent Yokley they were looking for Mr. Rashid.  *Id.* at 135.  At that point, the FBI "took a step back" and "let the local law enforcement officers and Jobs and Family Services investigate this case."  *Id.* at 136.

A couple months later in December, however, Agent Staderman spoke with Mr. Rashid's former landlord.  The landlord said that, while inspecting Mr. Rashid's home, he saw an AR-15, an AK-47, and a Glock in the house.  He also saw a pair of handcuffs in the basement.  *Id.* at 136.  The agents "ran [Mr. Rashid] through [their] database" and "learned that he was a convicted felon.  And after learning that Mr. Rashid was in the past and likely still in the possession of firearms, we opened a federal firearms case on Mr. Rashid."  *Id.*

3

The FBI began trying to find Mr. Rashid and C.M.  They conducted surveillance and tried to find a current address.  They learned that Mr. Rashid paid utilities at an address on Evangeline Road in Hamilton County ("the Hamilton County residence"). They obtained a search warrant for Mr. Rashid's phone, which provided his location via GPS.  Through that search warrant, they "confirmed the [Hamilton County] address." *Id.* at 137.  Mr. Rashid spent time there, but not much.  On another occasion, the agents received a GPS ping that placed Mr. Rashid around Colerain.  Agent Yokley personally saw Mr. Rashid's van.  He followed Mr. Rashid into Hamilton to another address: a house on Windsor Drive in Butler County ("the Butler County residence").  *Id.* at 137-38.

But the agents still had not seen the minor stepson so they planned to conduct further surveillance.  Since they were going to be "in the Forest Park area a lot kind of sitting," they debriefed the Forest Park Police Department in late January or early February.  *Id.* at 7; 138-39.  They met with Sergeant David DeSalvo.  *Id.* at 8; 138.  They explained the abuse allegations: the punching, the kicking, the handcuffs, and C.M.'s being locked in the storage unit without food or water.  *Id.* at 138.  They told Detective DeSalvo that if they could locate C.M., JFS would remove him with an emergency custody order.  *Id.* at 8.  They also told him that Mr. Rashid and C.M. were residing at the Hamilton County address "or at least frequented that address."  *Id.* at 9.

After the FBI briefing, Detective DeSalvo "conducted spot checks of the [Hamilton County] residence which entailed driving by to see" if Mr. Rashid's vehicle was there or if there was any other activity at the residence.  *Id.* at 10.  He was specifically looking for a Honda Odyssey, because that "was the primary vehicle that they thought they were

4

operating." *Id.*

**B. The traffic stop and the stepson's interview on February 4, 2020**

On February 4, 2020, Detective DeSalvo was performing a spot check on the Hamilton County residence. He saw the van in the driveway. He saw a person he believed to be Mr. Rashid carrying things in and out of the house and the vehicle. After some observation, he realized that there were two individuals. One of them appeared to be "a younger male, possibly juvenile." *Id.* at 11. Detective DeSalvo told Officer Lachman, who was in a marked police car, to position himself somewhere in the area in case the van left. *Id.* at 12.

A couple of hours later, the occupants of the residence entered the van and left. Detective DeSalvo advised Officer Lachman the van was moving. The van turned towards Officer Lachman's direction. Detective DeSalvo testified that Officer Lachman observed a traffic violation and conducted a traffic stop around 2:55 P.M. *Id.* at 14-15; 22.

About twenty minutes into the traffic stop (around 3:15 P.M.), Officer Lachman advised Detective DeSalvo that he believed the stepson was in the vehicle. *Id.* at 22. The detective, in turn, relayed that information to the FBI. *Id.* at 21. And Agent Staderman called Madison East, a supervisor at JFS, to tell her that the police had pulled over Mr. Rashid for a traffic stop and that C.M. was with him. Trans. 21; 61; 71. Ms. East confirmed with Detective DeSalvo that both Mr. Rashid and C.M. were at the traffic stop. *Id.* at 72. The detective also told her that Mr. Rashid "was going to be free to go soon, so whatever the agency needed to do, it needed to happen fairly quickly because—whatever ticket or whatever the law enforcement provided Karim, he was going to be free to go soon. They

had no reason to hold him." *Id.*

At JFS, Ms. East sent one of her investigators, Mr. Jesse Clark, "to the traffic stop in Forest Park . . . as soon as [she] got the call from [Agent Staderman]." *Id.* at 76. She also contacted her section chief and "quickly called" a prosecutor. *Id.* at 72. She explained that, since the initial call to the hotline in October, JFS had had difficulty locating the family, and that this was the "first time that the agency had the opportunity to intervene." *Id.* at 73.

The prosecutor gave her permission to seek an *ex parte* emergency order. So she called the Hamilton County juvenile court to speak with a magistrate. She swore under oath that the facts of the case "rose to the level of imminent risk for the children." *Id.* Based on the allegations concerning C.M., the agency believed there was imminent risk to all the other children. *Id.* at 74. Around 4:30 P.M., the magistrate granted an *ex parte* emergency order to take custody of all the children. *Id.*; Defendant's Exhibit 8.

While Ms. East was waiting to receive the order by fax, she called Mr. Clark again to tell him the magistrate had granted the order and that JFS would take custody of C.M. She also called Detective DeSalvo to tell him that Mr. Clark was on his way with the magistrate's order. *Id.* at 76. Since the FBI agents had advised JFS that Mr. Rashid potentially had access to weapons, the order provided for law enforcement assistance. *Id.* at 77.

Back at the traffic stop, Detective DeSalvo was "providing an officer safety presence for Officer Lachman while he was on his traffic stop." *Id.* at 23-24. There were some "perfunctory traffic stop-related issues." *Id.* at 24. They were trying to locate the

VIN and Mr. Rashid had offered an expired insurance card, so he was on the phone with his insurance company. *Id.* After JFS advised the officers that they had obtained the emergency custody order, Officer Lachman told Mr. Rashid that JFS would like to speak with him. It took Mr. Clark about a half hour to arrive, due to traffic and weather. When Mr. Clark arrived, Mr. Rashid spoke with him. The officers took custody of C.M. and drove him to the Forest Park Police Department to speak with JFS. *Id.* at 26-27. Mr. Rashid left without his car or person being searched. *Id.* at 24.

At the Forest Park Police Department, Mr. Clark and Agent Yokley interviewed C.M. C.M. confirmed that he lived at both the Hamilton County and Butler County addresses. *Id.* at 142. He reported that "they did have an address on Evangeline, they did have an address on Windsor" and that "he spent time at both addresses." *Id.* at 81. "He didn't know where his family would currently be located. It seemed like they were in the process of moving between two houses. There was stuff in both houses." *Id.*

C.M. also discussed his stepfather's treatment of him. He denied that Mr. Rashid had ever placed a handgun in his mouth. *Id.* at 145. But he divulged that Mr. Rashid would "hit[ ] him on the hands and feet with a stick . . . and it hurt, left his hands in a state where he couldn't use his hands and couldn't use his feet." *Id.* at 142. He said that Mr. Rashid would force his legs "into uncomfortable positions. He described it as being very painful. He couldn't walk afterwards." *Id.*

His food was limited primarily to beans and lentils. He had vinegar poured over his meals as punishment. He said he was handcuffed every night to a table downstairs. *Id.* at 143. The handcuffing had started about two years prior, when he was around 13.

7

*Id.* at 47-48; 79-80.  If he had to use the restroom in the middle of the night, he'd have to call out to someone else in the house for help.  He confirmed that he was forced to work in the storage unit without food or water.  He had to use a bedpan to relieve himself.  *Id.* at 47-48; 143.

As for firearms, C.M. said Mr. Rashid had them at home and always carried a black handgun when he made incense deliveries.  *Id.* at 48; 81; 143.  "He talked about how Karim had taught them how to do like safety drills with the guns in case somebody would come into the home just more so as in a protective way."  *Id.* at 82.  He "described being given firearms training himself.  His mom and all the siblings in the home were trained with a firearm to do intruder drills so that they could aim quickly . . . ."  *Id.* at 144.

During the interview, Mr. Clark observed injuries on C.M., "including a slight deformity to his nose as well as to his ear."  *Id.* at 49.  Consequently, Mr. Clark transported C.M. to Cincinnati Children's Hospital afterwards.  Due to the age of the injuries, medical professionals there "could not definitively say that they were from physical abuse but that they likely were."  *Id.*  Then Mr. Clark transported C.M. to a foster placement.  *Id.*

**C. Removal of the children and discovery of the firearms on February 4, 2020**

After the interview, the agents, some Forest Park police officers, and Ms. East went to the Hamilton County residence, but didn't find anyone there.  The agents and Ms. East, now joined by two officers of the Hamilton Police Department, then went to the Butler County residence.  *Id.* at 82-83; 145-46.

When they arrived, Agent Yokley knocked on the door and Carmalita McKinney—Mr. Rashid's wife—answered.  *Id.* at 85-86.  She was reluctant to let them in

at first.  But when she saw the magistrate's order, she gave them permission to speak with her and the children and invited them in.  *Id.* at 86.  After some conversation, Ms. McKinney directed one of the older children to gather the other children and their things, because they were "going to be going with [JFS]."  *Id.* at 149.

The children began getting ready.  There were six of them.  *Id.* at 88.  "They were going in and out of bedrooms, walking all over the house."  *Id.* at 149.  About 30 to 45 minutes after the children began getting ready to leave, Agent Yokley asked if any of the other law enforcement officers were downstairs with the other children.  Nobody was. So he walked "downstairs with the kids to essentially see what was going on."  *Id.* at 150.

It was dark downstairs.  Agent Yokley turned his flashlight on.  A teenage girl was talking with a small child on the couch.  He walked towards them.  A few feet from where they were sitting was an open door into a dark room.  All the children had been "in that vicinity, and for the last 30 minutes people had gone in and out of that house.  There was salad sitting right inside the door which looked like people had been in there."  *Id.* at 151. He walked in.  When he confirmed no one was in there, he turned to walk back out.  *Id.*

As he turned with his flashlight, the light illuminated an open space between a white fireplace and a stone wall.  It was a "fake fireplace slid in front of . . . what used to be like a hearth, a real fireplace."  *Id.* at 207.  The fireplace was "square to the wall and there [were] blocks, bricks behind it which looked to be a solid wall, but on the right there was a gap of a few inches."  *Id.* at 152.  Inside the gap, he saw a rifle.  He took a few steps closer and, without touching anything, using his flashlight, "clearly [saw] two rifles leaning up against the wall behind the fireplace and a gun box."  *Id.* at 152.

9

Agent Yokley told the other law enforcement officers about the rifles.  *Id.*  All told, the officers removed "a revolver, a .357 magnum, an assault style rifle, and a DPMS INC style rifle.  Each of the firearms were loaded with ammo in . . . the magazines."  *Id.* at 157-58.  That night, Mr. Rashid came home and the Hamilton Police Department placed him under arrest.  *Id.* at 158.

**D. The search warrants, discovery of more firearms on February 5, 2020, and indictment**

The next day, on February 5, 2020, the FBI agents obtained and executed search warrants for both homes and the van.  *Id.*  Bases for the search warrants included C.M.'s statements to law enforcement and the recovery of firearms from the Butler County residence from the previous day.  (*See* Doc. 21 at 14-15, PageID 82-83.)  The search warrant team recovered two more revolvers with ammunition.  (*See* Doc. 13.)

On February 19, 2020, a federal grand jury returned an indictment against Mr. Rashid.  Both counts charge Mr. Rashid with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and (2).  The first count pertains to the firearms recovered at the Hamilton County residence on Evangeline Road on February 5, 2020, pursuant to the search warrants.  The second count pertains to the firearms recovered at the Butler County residence on Windsor Drive on February 4-5, 2020, following the traffic stop.  Mr. Rashid made his initial appearance the same day and pleaded not guilty.  (Doc. 16.)

## ANALYSIS

Mr. Rashid's first motion asks the Court to suppress evidence from February 4,

2020. Specifically, it targets the stepson's statements to law enforcement officials and the seizure of the firearms at the residence where the authorities found the children (the Butler County residence). (Doc. 20.) The second motion seeks to suppress evidence from February 5, 2020, following the execution of the search warrants. (Doc. 21.) Mr. Rashid makes three overarching arguments: (1) the traffic stop and its extension to remove the stepson were unlawful, and therefore the stepson's statements at the police department should be suppressed; (2) law enforcement improperly executed the Hamilton County magistrate's emergency order on the Butler County residence, and therefore the firearms they discovered there should be suppressed; and (3) information obtained from the stop and the removal of the children should be redacted from the search warrants.

The Court will address each issue in turn.

**A. The traffic stop and its extension were legitimate.**

    **1. The traffic stop.**

The Fourth Amendment's prohibitions against the Government's unreasonable searches and seizures "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). The Sixth Circuit generally views ordinary traffic stops as akin to investigative detentions rather than custodial arrests. *E.g., United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Thus, the Court assesses whether the police acted reasonably based on the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005).

In evaluating an investigative stop based on reasonable suspicion, the Court

11

engages in a two-part analysis. *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). First: was there a proper basis for the stop? Second: if so, was the degree of intrusion reasonably related in scope to the situation at hand? *Id.* An investigatory stop is proper when, looking at the totality of the circumstances, the officer has a "reasonable, articulable suspicion that [a] person *has been*, is, or is about to be engaged in criminal activity." *Smith*, 594 F.3d at 536 (quoting *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir.2007). And, when assessing the degree of intrusion, the Court examines the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances. The scope of the stop depends on the circumstances that originally justified the stop. *Id.*

At the hearing, Detective DeSalvo stated that a basis for stopping Mr. Rashid was because his lights were on but his windshield wipers were off—a violation of Forest Park City Ordinance § 71.01. Trans. at 33. Mr. Rashid points out that the ordinance also provides that "no law enforcement officer shall cause the operator of a vehicle . . . to stop the vehicle *solely* because the officer observes that a violation . . . of this section has been or is being committed or for the *sole purpose* of issuing a ticket, citation, or summons . . . ." Forest Park City Ordinance § 71.01 (emphasis added). Therefore, according to Mr. Rashid, his violation of the city ordinance did not furnish the police officer with a legitimate basis for the traffic stop.

The Government argues that the officer did not stop Mr. Rashid solely for violating the ordinance. The ongoing child welfare investigation justified the stop. The Government also states that the officer also observed a turn signal violation. (Doc. 34,

12

Defendant's Exhibit 5.)

There is some debate over the turn signal.  (Doc. 42 at 4.)  Mr. Rashid argues that the dash cam video demonstrates that he used his turn signal properly.  The Court has reviewed the dash cam footage and Mr. Rashid appears to be correct.  What is beyond debate, however, is that the law enforcement agencies were investigating child abuse allegations and that this was the first time they had seen the minor stepson after a substantial period of searching.  Detective DeSalvo confirmed that, at the time of the stop, the officers were primarily concerned with the safety of the stepson.  Trans. 25.  Thus, the officer did not stop Mr. Rashid solely for violating the city ordinance.

Reasonable suspicion justified the traffic stop of Mr. Rashid.  The FBI had received information that Mr. Rashid was physically abusing a child, handcuffing that child to a table at night, and locking that child in a storage unit without food, water, or access to a restroom.  Third parties had corroborated material parts of those statements.  The storage facility manager confirmed he had found the stepson alone in Mr. Rashid's storage unit.  And a former landlord had discovered handcuffs and firearms at Mr. Rashid's house.

Mr. Rashid attempts to undermine the trustworthiness of the information in two ways.  First, he makes much of the fact that the Government has still not shared the identity of the confidential informant who made the statements to the FBI.  Second, he argues that the information had grown stale between October (when the agents first learned of the allegations) and February (when the police conducted the traffic stop).  He is mistaken on both counts.

***The informant's reliability***.  The fact that the Government has not disclosed the

identity of the informant does not make the informant anonymous or unreliable.  The Sixth Circuit has recently affirmed that non-anonymous tips are more reliable than anonymous tips when it comes to establishing reasonable suspicion.  *United States v. Betts*, 806 F. App'x 426, 430 (6th Cir. 2020) (citing *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)).  And, in this case, the agents corroborated much of the informant's material information, through speaking with the storage facility manager (who told the agents that he had found the stepson enclosed in the storage unit) and by seeing Mr. Rashid there (confirming that he owned the unit).  Accordingly, the officers had a reasonable and articulable suspicion that Mr. Rashid had been engaged in criminal activity.

   *Staleness*.  Most of the case law on staleness in the Sixth Circuit relates to the quality of information demonstrating probable cause in support of a search warrant; but the same principles apply when assessing whether the facts a police officer relied upon in making a stop support a finding of reasonable suspicion.  *United States v. Greene*, No. 1:12-CR-129-14, 2014 WL 1745648, at *3 (E.D. Tenn. May 1, 2014).  Staleness does not depend on an "arbitrary time limitation," but rather on the character of the crime, the criminal defendant, the thing to be seized, and the place to be searched.  *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998).  The passage of time is less significant when the activity is protracted or continuous.  *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988).  "In situations where the criminal activity is of an ongoing nature, it will take longer for the information to become stale."  *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004).

14

In this light, the information about child abuse was not stale. Indeed, the character of the alleged crime—abuse of a child—was grounds for continuing concern. No facts in the record suggest that law enforcement or JFS could have assumed that the threat to C.M. had ended since October. On the contrary, Ms. East noted the urgency of taking custody of C.M. as soon as she learned of the traffic stop. She testified that the hotline narrative she had received had many "concerning allegations in it, and provided insight that the family had been very hard to locate from October to November and we're here at the end of January into February and this is the first time that the agency had the opportunity to intervene." Trans. 72-73. Thus, the age of the information did not deprive them of the reasonable suspicion that criminal activity had occurred and was still occurring.

### 2. Extension of the traffic stop.

Mr. Rashid also claims that, since the citation was completed at 3:21 PM but C.M. was not removed until 4:06 PM, the detention's duration was unlawful. *See Rodriguez v. United States*, 575 U.S. 348, 349, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015) ("Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."); *United States v. Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008) ("Under the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity.") From the Government's perspective, the child welfare allegations justified the duration of the stop.

"To detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in

15

more extensive criminal conduct." *Urrieta*, 520 F.3d at 574. When considering the reasonableness of a traffic stop's prolongation, the Court focuses, not on the "the reasonableness of *the interval of prolongation* in isolation," but instead asks "whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*" was reasonable. *United States v. Everett*, 601 F.3d 484, 493–94 (6th Cir. 2010).

Under the circumstances here, the officers had both reasonable suspicion and statutory grounds for extending the stop. As discussed above, they had the reasonable, articulable suspicion that Mr. Rashid had abused his stepson. Furthermore, they lawfully extended the stop in order to execute the *ex parte* emergency removal order. Ohio Revised Code § 2151.31(A)(6) provides that "[a] child may be taken into custody . . . [b]y a law enforcement officer or duly authorized officer of the court when . . . [t]here are reasonable grounds to believe that the conduct, conditions, or surroundings of the child are endangering the health, welfare, or safety of the child." The magistrate heard sworn testimony from a JFS supervisor that the facts of the case rose to the level of an imminent risk for C.M. and his siblings. He signed an *ex parte* emergency order to remove the children. Trans. 74. He found that removal of the children was "necessary to prevent immediate or threatened physical or emotional harm" and that the children "may abscond or be removed from the jurisdiction of the court." (Doc. 34, Defendant's Exhibit 8.) All the players acted quickly in order to obtain the order and arrive to the scene of the stop. This was the first time law enforcement or JFS had located C.M. since October, after diligent efforts to locate the family. Trans. 72-74. Therefore, the totality of the circumstances show that the duration of the stop as a whole was reasonable. *Everett*, 601

F.3d at 493–94.

### 3. The stepson's statements were not fruits of the poisonous tree.

The foregoing conclusions resolve Mr. Rashid's argument that C.M.'s statements at the police department should be excluded as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The exclusionary rule applies to "evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016) (cleaned up). But the tree here was not poisonous. Reasonable suspicion supported the traffic stop and the *ex parte* emergency order justified C.M.'s removal from Mr. Rashid's custody. Therefore, C.M.'s statements at the police department were not the product of unlawful police action. *See Alderman v. United States*, 394 U.S. 165, 174, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."). Because Mr. Rashid has shown no infringement of his constitutional rights, the Court will not suppress C.M.'s statements. *United States v. Noble*, 762 F.3d 509, 526 (6th Cir. 2014) ("for a defendant to argue successfully that evidence should be suppressed, he must show, as an element of his claim, that the government infringed upon his Fourth Amendment rights").

### B. Law enforcement officials were at the Butler County residence legitimately.

Mr. Rashid argues that the FBI misrepresented where he was living by failing to disclose to JFS that he had a Butler County residence. From his perspective, the FBI "created" a Hamilton County case even though they knew that he lived in Butler County

17

(*see* Doc. 39 at 12), and therefore had no jurisdiction to execute the Hamilton County order on the Butler County residence. And, the argument continues, without a legitimate reason to be at the Butler County residence, the FBI agent's discovery of the rifles in the home must be suppressed.

Pushing back, the Government states that the case originated at the storage facility in Hamilton County and that Mr. Rashid did indeed have a residence in Hamilton County. In the Government's view, it was Mr. Rashid, not the Government, that created the ambiguity as to where he lived. Phone pings came through at both locations and he was paying utilities at the Hamilton County residence. The Government points out that the phone pings simply signal where Mr. Rashid was, not the children—but when C.M. was first spotted, it was in Hamilton County. And, because the order was for all of the children, not just C.M., and they did not find the other children at the Hamilton County residence, they naturally, and properly, went to the Butler County residence.

The Government has the better argument, for the following reasons.

1. **Execution of the Hamilton County order**.

Mr. Rashid argues that the Hamilton County order was "without proper jurisdiction" because the officers executed it in Butler County. (Doc. 39 at 12.) Two issues arise. First, did JFS properly obtain the removal order from a Hamilton County magistrate? Second, did the authorities properly execute the order in Butler County?

***Obtaining the order from a Hamilton County magistrate.*** The answer to the first question is clearly yes. R.C. § 2151.31 provides that a child may be taken into custody by a law enforcement officer or duly authorized officer of the court when reasonable

18

grounds justify the belief that the child's conditions or surroundings endanger his health, welfare, or safety. There is no relevant constraint in that statute on what county the child needs to be in when that removal happens. Here, though, C.M. was in Hamilton County at the time the authorities obtained the order. Furthermore, one of the specific abuse allegations—that Mr. Rashid kept C.M. enclosed in a storage facility without food, water, or access to a restroom—took place in Hamilton County. The storage facility is located at 2201 Moellering Avenue, Cincinnati, Ohio 45214. (Doc. 41-1, PageID 482.) The Court takes judicial notice that that address is in Hamilton County. *United States v. Holder*, 603 F. App'x 368, 370 (6th Cir.), *cert. granted, judgment vacated on other grounds*, 135 S. Ct. 2940, 192 L. Ed. 2d 969 (2015) (taking judicial notice of a location is proper under the Federal Rules of Evidence so long as the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *United States v. Chaffee*, No. 18-11559, 2019 WL 8403506, at *19 (E.D. Mich. Nov. 8, 2019), *report and recommendation adopted*, No. 18-11559, 2020 WL 1316643 (E.D. Mich. Mar. 20, 2020). Thus, the storage facility serves as a clear nexus between the abuse allegations and Hamilton County. *See* O.R.C. § 2151.27(A)(1) (a complaint with respect to child abuse may be filed in the county where the abuse allegedly occurred).

Finally, Mr. Rashid cannot demonstrate that he lacks ties to Hamilton County. He was seen at the Hamilton County residence with C.M. Even C.M. said that he "didn't know where his family would currently be located." Trans. 81. The family was in the process of moving and there was "stuff in both houses." *Id.* at 81. Thus, the children who were the subject of the emergency order had ties to both counties.

19

For these reasons, JFS clearly had statutory authority to seek the order from a Hamilton County magistrate.

*Executing the order in Butler County*.  On to the second question: did the authorities properly execute the Hamilton County order in Butler County?  Mr. Rashid doesn't think so, citing a case in which the Sixth Circuit noted that a judge seated in one county did not have jurisdiction to issue warrants in another county.  *United States v. Master*, 614 F.3d 236, 239-41 (6th Cir. 2010).

But Mr. Rashid fails to address something important about *Master*.  The panel did not exclude the evidence.  Instead, it remanded the case to the district court to perform a balancing analysis under *Herring v. United States*, 555 U.S. 135, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).  After a *Herring* analysis, the district court denied the motion to suppress.  The Sixth Circuit agreed that "[u]nder the *Herring* balancing test the benefits of deterrence, if any, do not outweigh the costs."  *United States v. Master*, 491 F. App'x 593, 597 (6th Cir. 2012).

*Master* poses two hurdles for Mr. Rashid.  First, the circumstances are different here.  In *Master*, a specific state law provided that the judge had no jurisdiction to issue search warrants for another county.  *Master*, 614 F.3d at 241.  Mr. Rashid has not pointed to anything so clear here.  In fact, R.C. § 2151.31(A)(6) works against his argument, because it provides for the removal of a child, without relevant constraints regarding counties, when there are reasonable grounds to believe the child's conditions or surroundings are endangering his health, welfare, or safety.  The magistrate made the order pursuant to that statute and it applied to all the children, not just C.M.  Thus, the

20

officials had statutory authority to enforce the *ex parte* emergency order with respect to C.M.'s siblings.

Second, even if the officers did negligently execute the order in Butler County, a balancing test under *Herring* results in the same outcome as in *Master*. The Government argues that a *Herring* analysis precludes suppression of the seizure of the weapons from the Butler County residence. Mr. Rashid does not address *Herring*.

Under *Herring*, "the benefits of deterrence must outweigh the costs [of excluding the evidence]." *Id. Herring* recognized that the exclusionary rule is not an individual right and that it only applies when it results in an "appreciable deterrence." *Herring*, 555 U.S. at 141. On one hand, application of the exclusionary rule could "provide some incremental deterrent." *Id.* On the other hand, "[t]he principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)). The deterrence benefits of exclusion vary depending on how culpable the law enforcement officials were. *Davis v. United States*, 564 U.S. 229, 238, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011).

The deterrence benefit here barely registers. The government officials had located Mr. Rashid and C.M. after several months of trying to locate them. They went through the proper channels of obtaining the *ex parte* emergency order. The order applied to all the children, who had ties to Hamilton County based on C.M.'s interview. After taking custody of C.M., they went to the Hamilton County residence to see if the children were there. They weren't, so they went to the only other residence they knew the children

21

might be. Under these circumstances, the government conduct here falls well short of deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights. *See id.*

The cost of exclusion, on the other hand, weighs more heavily. Exclusion here would discourage law enforcement from removing minor children from situations in which reasonable grounds exist to believe their health, welfare, or safety is at risk. *See* R.C. § 2151.31(A)(6). Therefore, even if the officials negligently executed the order in Butler County, the costs of exclusion outweigh the benefits of deterrence. *Herring*, 555 U.S. at 141.

### 2. Discovery of the firearms.

Mr. Rashid argues that the FBI agent had no authority to be in the lower level of the Butler County residence. He also takes issue with the fact that, once the agent was downstairs, he went into the room where he eventually saw the rifles. The Government argues that the agent was just making sure he knew where the members of the family were, mindful that Mr. Rashid had trained them to use firearms. Trans. 215-16.

In *Maryland v. Buie*, the Supreme Court justified the use of "protective sweeps" if an officer possesses the reasonable belief that, based on specific and articulable facts and their rational inferences, the area "harbored an individual posing a danger to the officer or others." 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990). A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.*

The Sixth Circuit has agreed with the proposition that an arrest is not a mandatory prerequisite for conducting a protective sweep of an area. *United States v. Taylor*, 248 F.3d

506, 513 (6th Cir. 2001). "In order for officers to undertake a protective sweep of an area they must articulate facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene." *United States v. Biggs*, 70 F.3d 913, 915 (6th Cir. 1995). The limited purpose of this kind of cursory protective sweep is officer safety. *Taylor*, 248 F.3d at 513-14. *See also, e.g., United States v. Martins,* 413 F.3d 139, 150 (1st Cir. 2005) ("[T]he key is the reasonableness of the belief that the officers' safety or the safety of others may be at risk."), *cert denied* 546 U.S. 1011, 126 S.Ct. 644, 163 L.Ed.2d 520 (2005), *abrogated on other grounds by Hill v. Walsh*, 884 F.3d 16 (1st Cir. 2018); *United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005) ("specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant"); *United States v. Gould*, 364 F.3d 578, 584 (6th Cir. 2004) (en banc) ("arrest is not always, or *per se*, an indispensable element of an in-home protective sweep"), *cert denied*, 543 U.S. 955, 125 S.Ct. 437, 160 L.Ed.2d 317 (2004), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011); *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1983) (protective sweep, performed before arrest was made, led to discovery of firearm in plain view). *But see United States v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006).

The government officials here had learned that, not only were there firearms in the house, but the members of the family knew how to use them. They even practiced drills in shooting intruders. Still more, at the time when the agent went downstairs, not all the children were unaccounted for and no one was downstairs. Trans. 216. When asked why

23

he went into the room near where the two children were, the agent answered, "I had just sat through a two-hour interview where a child told me that other children were trained to shoot intruders with guns. There were two children sitting on the couch right next to that door. So I thought it was prudent to look inside that room to see where everyone had been walking around downstairs." Trans. 215-16. Under these circumstances, the agent was within constitutional parameters to walk downstairs and into the room, refrain from touching anything, and use his flashlight in the dark to ensure the safety of the officers and others. *See Taylor*, 248 F.3d at 513-14.

Mr. Rashid claims that, once the agent was in the room, he had no lawful right to investigate the space between the fireplace and the wall. The Government invokes the plain view doctrine. "Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)).

When the agent turned to leave the room and his light happened upon the gap between the fireplace and stone wall, he was accounting for the children's whereabouts and ensuring that the area was safe. In other words, he was lawfully in a position from which he could view that space. *Id.* He testified that "I know what a rifle looks like." Trans. 152. That's another way of saying he immediately recognized the incriminating nature of what he saw in the gap. The picture in Government Exhibit 5.6 supports the agent's testimony that he "could very clearly see" a firearm. Trans. 152. And as the

24

agents already knew that Mr. Rashid was a convicted felon and therefore prohibited from possessing firearms, they had the lawful right to access the rifles. *Id.* at 136.

Based on the foregoing, the agent lawfully observed a firearm in plain view.

### C. Nothing in the search warrants needs to be redacted.

Rashid argues that the information used to justify the search warrants—that is, the information based on C.M.'s statements and the subsequent discovery of firearms on February 4—was obtained in violation of the Fourth Amendment. Accordingly, he claims, that information must be redacted from the two search warrants as fruits of the poisonous tree. *United States v. Bah*, 794 F.3d 614, 633-34 (6th Cir. 2015). He argues that, absent that information, the search warrants are bare bones and lack probable cause. (Doc. 21.)

The Court has found that it is inappropriate to suppress the stepson's statements or the discovery of firearms on February 4, 2020. *See supra* at 17, 24-25. Thus, the search warrants' use of that information is legitimate. Accordingly, the Court denies the motion to suppress evidence from the February 5 searches.

## CONCLUSION

For the reasons above, the Court **DENIES** Mr. Rashid's motions to suppress (Docs. 20 and 21.)

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND

25